**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

AMERICAN TRANSIT INSURANCE COMPANY,

**Plaintiff,**

-against-

MEDSOURCE SOLUTIONS, INC, ILYA TADCHIEV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,

**Defendants.**

CIVIL ACTION

22-CV-5317

COMPLAINT

(TRIAL BY JURY DEMANDED)

Plaintiff American Transit Insurance Company (collectively "**Plaintiff**" or "**American Transit**"), by their attorneys, Morrison Mahoney, LLP, for their Complaint against Defendants Medsource Solutions, Inc ("Medsource Solutions") and Ilya Tadchiev ("Tadchiev") (Tadchiev and Medsource Solutions are collectively referred to herein as the "Retail Defendants"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively referred to herein with the Retail Defendants as "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.      From April 2018 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiff, through New York State's No-fault system.

2.      This action seeks to recover more than $61,500.00 that Defendants stole from Plaintiff through the submission of numerous false and/or fraudulent insurance claims for purported rehabilitative durable medical equipment ("DME") devices, in particular, Sustained Acoustic Medicine ("SAM") devices (alternatively referred to herein as "SAM devices" or "Rental DME").

3.     At all relevant times mentioned herein, each and every piece of Rental DME supplied by Medsource Solutions was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.     To execute the scheme to defraud alleged herein, Defendant Tadchiev, through Medsource Solutions, entered into separate arrangements with one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.     Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to one or more of the following:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

(ii) fabricating and/or falsifying DME prescriptions by:

(a) utilizing blank prescription forms signed by their HCPs in order to unilaterally fill in the prescription with expensive and unnecessary DME; and/or

(b) fraudulently altering otherwise valid prescriptions issued by their HCPs by adding or changing the DME prescribed in order to conform the prescription to a pre-determined protocol designed to maximize reimbursement by insurance companies; and/or

2

(iii) ensuring that the prescriptions were sufficiently generic and/or formulaic so that the nature, quality and cost and medical necessity of any DME could not be verified based on the description of the prescribed item alone.

6.      The use of generic and/or formulaic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME prescribed and dispensed to the patient, if any items were legitimately prescribed and dispensed at all; (ii) misrepresent the medical necessity of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiff, in particular.

7.      Pursuant to the fraudulent prescriptions, Medsource Solutions routinely provided (or purported to provide) a portion of a nearly identical battery of DME to persons injured in automobile accidents insured by Plaintiff (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiff in particular.

8.      On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the No-fault Clinics to the Retail Defendants to support their claims for reimbursement.

9.      On information and belief, in many instances, Tadchiev submitted to Plaintiff, through Medsource Solutions, prescription forms which they knew to be fabricated and/or fraudulently altered, in order to misrepresent the quality and medical necessity of Rental DME actually prescribed by the No-fault Clinics' HCPs, if any were prescribed at all.

10.     After obtaining the fraudulent prescriptions from the No-fault Clinics, Tadchiev, through Medsource Solutions, generated and submitted bills to Plaintiff, among others, knowingly misrepresenting the nature and quality of the items, the amounts they were entitled to be reimbursed and/or the medical necessity of the purportedly prescribed DME.

11.     In carrying out the scheme to defraud, Defendants stole in excess of $61,500.00 from Plaintiff by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq.* (popularly known as the "No-fault Law").

### STATUTORY/REGULATORY SCHEME

12.     Pursuant to the No-fault Law, Plaintiff is required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

13.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiff for DME that was never provided, not provided as billed or, if provided, was otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME.  Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiff to Medsource Solutions for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

14.     Defendant Medsource Solutions is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Medsource Solutions accepted (and continues to accept) assignments of

benefits from Covered Persons and submitted (and continues to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

15.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq.*, Medsource Solutions  submitted (and continues to submit) bills for its claims to Plaintiff using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form.

16.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiff by Medsource Solutions contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

17.     At all relevant times mentioned herein, Retailer Defendants identified the DME and/or orthotic devices it purported provided to Covered persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia* durable medical equipment and orthotic devices.

18.     At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff was (and is) required to promptly process claims within 30 days of receipt of proof of claim.

19.      At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a

DME provider, may recover for health service related expenses. In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

20.    By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

21.    At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

22.    At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services..."

23.    Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. seq.*), established a fee schedule the reimbursement of durable medical equipment and

medical supplies by adopting New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances.

24.     The 28th Amendment to Regulation 83 provided :

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable in accordance with Medicaid rules, for the specific item, then the fee payable, shall be the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

25.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Medicaid DME Fee Schedule"), 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021), which lists such devices by corresponding HCPCS Level II code.

26.     In view of the adoption by the WCB of the Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Medicaid DME Fee Schedule that was, and is, in effect at all relevant times mentioned herein prior to April 4, 2022.

27.     Accordingly, at all relevant times mentioned herein, for DME and/or orthotic devices provided prior to April 4, 2022, providers of DME are entitled to reimbursement in the amounts set forth in the Medicaid DME Fee Schedule.  At all relevant times mentioned herein for DME and/or orthotic devices provided prior to April 4, 2022, for Non-Medicaid DME Fee Schedule items, the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2011) (sometimes referred to herein as the "Lesser of Standard").

28.     At all relevant times mentioned herein prior to April 4, 2022, under the Medicaid DME Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

29.     Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

30.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Medicaid DME Fee Schedule remained effective for Workers' Compensation claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard on April 4, 2022. New York Workers' Compensation Board Bulletin No. 046-1408 (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1408.jsp) and Bulletin No. 046-1496 (http://www.wcb.ny.gov/content/main/SubjectNos/sn046_1496.jsp).

31.     In relevant part, for DME and/or orthotic devices provided on or after April 4, 2022, the WCB established its own fee schedule for DME and orthotic devices, to replace its prior adoption of the Medicaid DME Fee Schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances. (hereinafter "WCB DME Fee Schedule") *See* 12 N.Y.C.R.R. § 442.2(a) (WCB DME Fee Schedule and Medicaid DME Fee Schedule are collectively referred to as the "Fee Schedule").

32.     Like the Medicaid DME Fee Schedule, the WCB DME Fee Schedule listed DME and orthotic devices by their corresponding HCPCS Level II Codes.

33.     As part of the WCB's amendments to the Medicaid DME Fee Schedule, the available DME on the WCB DME Fee Schedule was updated, the reimbursement rates were increased, and a prior authorization process was established for certain DME in the WCB DME Fee Schedule for which no reimbursement rate is listed and/or for DME not listed in the WCB DME Fee Schedule.  As a result of these amendments, the WCB eliminated the prior Lesser of Standard that had existed for Non-WCB DME Fee Schedule items.

34.     With respect to rental DME, at relevant times mentioned herein on or after April 4, 2022, under the Fee Schedule, providers of rental DME are limited to:

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2).

35.     In the event that a DME item was not listed on the WC DME Fee Schedule the WCB adopted a prior authorization requirement through which a DME provider must obtain prior authorization, including for a proposed purchase price or rental rate for the equipment, before supplying the rented DME. 12 N.Y.C.R.R. § 442.2(b)(1)(2).

36.     Except as rendered inapplicable to reimbursement of No-fault claims by Regulation 83, the WCB DME  Fee Schedule applies to the reimbursement of items listed in the WCB DME Fee Schedule.

37.     Pursuant to Regulation 83, the requirements of prior authorization under the WCB DME Fee Schedule does not apply to the reimbursement of claims under the No-fault law.

38.     The Department of Financial Services recognized that the WCB's elimination of the Lesser of Standard for reimbursement of items not listed on the WCB DME Fee Schedule creates a system, in the context of reimbursement under the No-fault law, for fraud and abuse, with no cost-containment systems in place and the possibility for nefarious DME providers to bill for DME at exorbitant, unchecked rates.

39.    To address the potential for fraud and abuse, by emergency adoption of the 36th Amendment to Regulation 83 dated April 4, 2022, the DFS reinstated the Lesser of Standard for reimbursement of DME under the No-fault law, limiting the maximum purchase and total accumulated rental prices for Non-WCB DME Fee Schedule items as follows:

**Part E. Durable medical equipment fee schedule**.

(a) This Part shall apply to durable medical equipment not listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule and to durable medical equipment listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule for which no fee has been assigned.

(b) As used in this Part, acquisition cost means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax.

(c) The maximum permissible purchase charge or the total accumulated rental charge for such durable medical equipment shall be the lesser of the:

(1) acquisition cost plus 50%; or

(2) usual and customary price charged by durable medical equipment providers to the general public.

40.    By Emergency Adoption dated June 30, 2022, DFS extended its reinstatement of the Lesser of Standard for reimbursement of DME under the No-fault law for an additional 90 days.  https://www.dfs.ny.gov/system/files/documents/2022/06/re83_amend36_text_20220630.pdf

41.    At all times relevant times mentioned herein from April 4, 2022 through the present, with respect to DME items that are not listed on the WCB DME Fee Schedule and/or listed on the WCB DME Fee Schedule but for which no fee has been assigned (hereinafter "Non-WCB DME Fee Schedule" items) (Non-WCB DME Fee Schedule items and Non-Medicaid DME Fee Schedule items collectively referred to as "Non-Fee Schedule" items), the Lesser of Standard as

reflected in the Emergency Adoption to Regulation 83 dated April 4, 2022 and thereafter extended by Emergency Adoption dated June 30, 2022.

42.     At all relevant times relevant herein from April 4, 2022 through the present, a provider's acquisition cost is "the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax. 11 N.Y.C.R.R. § App.17-C Part E(b) (promulgated by April 4, 2022 and June 30, 2022 Notices of Emergency Adoption).

43.     At all relevant times mentioned herein, pursuant to Section 5108(c) of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

44.     Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

45.     At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiff by Tadchiev, through Medsource Solutions, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the DME provided, if provided at all, as well as the cost, quality, and medical necessity of the billed-for DME.  To the extent the DME was provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

46.     On information and belief, in furtherance of the scheme to defraud alleged herein, Defendants, as a matter of pattern, practice and protocol, routinely provided Covered Persons with

expensive rental DME items that were medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

47.     As part of a fraudulent protocol of treatment, contemporaneously with receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools; back braces, cervical collars, knee braces, and/or shoulder braces, the Covered Persons are prescribed SAM devices, and, in some instance, are eventually referred for expensive arthroscopic surgery and/or pain management procedures at ambulatory surgical centers ("ASCs") throughout New York and New Jersey in furtherance of the scheme of unnecessary referrals in order to maximize reimbursement.  In most cases, Medsource Solutions delivers to the Covered Persons the expensive SAM devices, that were not medically necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration, at the same time or within days of the Covered Persons' receipt of the aforementioned standard battery of DME.  The Covered Persons are regularly prescribed these SAM devices for up to 42 days, with accompanying patches, exceeding $3,000.00 in a total cost for a single item as part of the scheme to financially enrich Medsource Solutions, among others, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

48.     On information and belief, Medsource Solutions was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

49.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the

Defendants, who, to the extent that they provided any DME and/or orthotic devices at all, provided Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

50.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud— although that would be troubling enough—rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity.  Every facet of Defendants' operations, from securing fraudulent prescriptions for DME pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical necessity for the DME purportedly provided, was carried out for the purpose of committing fraud.

51.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME.  In doing so, Plaintiff seeks compensatory damages and declaratory relief that Plaintiff is not required to pay any of the Retail Defendants' No-fault claims because the Defendants submitted (1) false and fraudulent insurance claims for medically unnecessary DME to Plaintiff deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiff for DME the Defendants never actually supplied to Covered Persons.  Such claims continue to be submitted by and/or in the name of Medsource Solutions and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiff.

52.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing in excess of $72,500.00 in unpaid No-fault claims that form the basis of Plaintiff's request for declaratory relief.

## NATURE OF THE ACTION

53.     This action is brought pursuant to:

    i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

    ii)     New York State common law; and

    iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

54.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff seeks treble damages, which they sustained as a result of the Defendants' schemes to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiff for DME they allegedly provided to individuals covered by Plaintiff under New York State's No-fault Law.

55.     Plaintiff further seeks a judgment declaring that they are under no obligation to pay any of the Retail Defendants' unpaid No-fault claims because:

    i)      The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiff; and

    ii)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

56.     As a result of Defendants' actions alleged herein, Plaintiff was defrauded of an amount in excess of $61,500.00, the exact amount to be determined at trial, in payments which

Defendants received for fraudulently billing Plaintiff for DME and/or orthotic devices that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

**A.      Plaintiff**

57.      Plaintiff American Transit Insurance Company is a corporation duly organized and existing under the laws of the State of New York, having its principal place of business in Brooklyn, New York.

58.      Plaintiff is duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State law.

**B.      The Individual Defendant**

59.      Ilya Tadchiev ("Tadchiev") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retailer Medsource Solutions Inc. and, at all times relevant herein, operated, managed, and/or controlled its activities.

**C.      The Retailer Defendant**

60.      Medsource Solutions, Inc ("Medsource Solutions") was incorporated on or about April 11, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 58-47 Francis Lewis Boulevard, Flushing, NY 11364.  Medsource Solutions is operated, managed, and/or controlled by Defendant Tadchiev and submitted fraudulent claims to Plaintiff seeking reimbursement for DME and/or orthotic devices under the No-fault Law.

**D.**    **The John Doe Defendants**

61.    On information and belief, John Does 1 through 5 are individuals that are unknown to Plaintiff, who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E.**    **The ABC Corporations**

62.    On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiff that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

**JURISDICTION AND VENUE**

63.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

64.    This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

65.    Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

66.    Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the

Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS
## APPLICABLE TO ALL CAUSES OF ACTION

67.     Plaintiff underwrites automobile insurance in New York State and participates as an insurer in New York State's No-fault program.

68.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiff is required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

69.     Medsource Solutions is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for their services, Medsource Solutions accepts assignments of benefits from the Covered Person covered under the No-fault Law and submits claims for payment to No-fault insurance carriers, in general, and to Plaintiff, in particular.

70.     To process and verify the claims submitted by Medsource Solutions, Plaintiff required, and Medsource Solutions submitted, prescriptions and other documents relating to the DME allegedly supplied to Covered Persons for which Medsource Solutions was seeking reimbursement from Plaintiff.

71.     In nearly all instances, the prescriptions submitted in support of Medsource Solutions' claims for reimbursement were fraudulent, fabricated, and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

72.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiff in particular, Retailer Defendants made the following representations to each recipient:

- The bill for DME and/or orthotic devices was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for DME and/or orthotic device(s) was not issued pursuant to any unlawful financial arrangements;

- The DME and/or orthotic device(s) identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items

- The billing code used on the bill actually represents the DME and/or orthotic device(s) and all included services that was provided to the Covered Person; and

- The fee sought for the billed for DME and/or orthotic device(s) did not exceed that permissible under the No-fault law and regulations.

73.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiff is required to promptly process Medsource Solutions' claims within 30 days of receipt of proof of claim.

74.     To fulfill their obligation to promptly process claims, Plaintiff justifiably relied upon the bills and documentation submitted by Medsource Solutions in support of their claims, and paid Medsource Solutions based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiff.

75.     At all relevant times mentioned herein, the No-fault law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

76.     At all relevant times mentioned herein, for DME and orthotic devices provided to Covered Persons prior to April 4, 2022, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2. (effective through June 7, 2021)

77.     At all relevant times mentioned herein prior to April 4, 2022, with respect to DME and/or medical supplies for which the Medicaid DME Fee Schedule has not established a fee ("Non-Medicaid DME Fee Schedule Items"), the regulation provides that the fee payable shall be the lesser of:

    (1)    the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

    (2)    the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2 (effective through June 7, 2021).

78.     At all relevant times mentioned herein, prior to April 4, 2022, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."   12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

79.     Furthermore, at all relevant times mentioned herein prior to April 4, 2022, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in

subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

80.     On April 4, 2022, the WCB's amendments to the fee schedule by the WCB took effect, including the establishment of the WCB DME Fee Schedule.  As part of the WCB's amendments to the WCB DME Fee Schedule, the available DME on the WCB DME Fee Schedule was updated, the reimbursement rates were increased, and a prior authorization process was established for certain DME in the WCB DME Fee Schedule for which no reimbursement rate is listed and/or for DME not listed in the WCB DME Fee Schedule.  As a result of these amendments, the WCB eliminated the prior Lesser of Standard that had existed for Non-Fee Schedule items.

81.     At all relevant times mentioned herein for DME and/or orthotic devices provided on or after April 4, 2022, the Worker's Compensation Board has adopted its own fee schedule for DME and orthotic devices to replace its prior adoption of the fee schedule set by the New York State Medicaid Program. 12 N.Y.C.R.R. § 442.2. New York Workers' Compensation Board Bulletin Nos. 046-1408 (May 24, 2021), 046-1496 (Feb. 3, 2022).

82.     At all times mentioned herein on or after April 4, 2022, for WCB DME Fee Schedule rental DME, the fee payable shall be :

> The maximum permissible monthly charge for the rental of durable medical equipment shall be the rental price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule multiplied by the total number of months or weeks respectively for which the durable medical equipment is needed. In the event the total rental charge exceeds the purchase price, the maximum permissible charge for the durable medical equipment shall be the purchase price listed in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule, whether or not the claimant keeps the durable medical equipment or returns it when no longer needed.

12 N.Y.C.R.R. § 442.2(a)(2)

83.     In the event that a DME item was not listed in the WCB DME Fee Schedule, the WCB adopted a prior authorization requirement through which a DME provider must obtain prior authorization, including for a proposed purchase price or rental rate for the equipment, before supplying the rented DME. 12 N.Y.C.R.R. § 442.2(b)(1)(2).

84.     In view of the WCB's elimination of the Lesser of Standard, resulting in the absence of a cost control measure for Non-WCB DME Fee Schedule items and the potential for exorbitant prices and unlimited rental charges that could far exceed the purchase price of the DME, the DFS Superintendent deemed it necessary to adopt an emergency amendment to 11 N.Y.C.R.R. § 68 (Regulation 83) to cap the purchase and total accumulated rental prices for Non-WCB Fee Schedule items.

85.     Accordingly, at all relevant times mentioned herein on or after April 4, 2022, for Non-WCB Fee Schedule DME, the fee payable shall be: [t]he maximum permissible purchase charge or the total accumulated rental charge for such durable medical equipment shall be the lesser of the: (1) acquisition cost plus 50%; or (2) usual and customary price charged by durable medical equipment providers to the general public. 11 N.Y.C.R.R. § App.17-C Part E (c) (promulgated by April 4, 2022 and June 30, 2022 Notices of Emergency Adoption).  As used in the regulation, "*acquisition cost* means the line-item cost to the provider from a manufacturer or wholesaler net of any rebates, discounts or valuable consideration, mailing, shipping, handling, insurance costs or sales tax." 11 N.Y.C.R.R. § App.17-C Part E (b) (promulgated by April 4, 2022 and June 30, 2022 Notices of Emergency Adoption).

86.     Medsource Solutions was created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for DME that was never provided, was not provided as billed or, if provided, was otherwise medically unnecessary and provided pursuant to a

predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of DME.

87.     The DME that Medsource Solutions purported to provide, and for which it billed Plaintiff, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.   Instead, Tadchiev, through Medsource Solutions, created a billing apparatus implementing a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

88.     Tadchiev created and controlled Medsource Solutions, which was part of a well-organized illegal enterprise that engaged in a pervasive fraudulent practice that distinguished it from legitimate providers of DME.   The components of the enterprise followed practices that were part of a racketeering scheme dictated by Medsource Solutions, including, but not limited to, the one of more of the following practices:

- Unlike legitimate retail DME companies, Tadchiev, through Medsource Solutions, misrepresented the nature, quality, and cost of DME and/or orthotic devices purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Tadchiev, through Medsource Solutions, submitted bills to Plaintiff misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Tadchiev, through Medsource Solutions, submitted bills to Plaintiff for DME that were never provided to Covered Persons;

- Unlike legitimate retail DME companies, Tadchiev, through Medsource Solutions, misrepresented the usual and customary price of the Non-fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Tadchiev, through Medsource Solutions, concealed the fact that the DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Tadchiev, through Medsource Solutions, and/or those acting under their direction and control, had agreements and/or understandings as to what DME would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Tadchiev, through Medsource Solutions, arranged to have prescriptions for DME delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers;

- Unlike legitimate retail DME companies, Medsource Solutions claimed to conduct their daily operations from locations that in some cases had no signage or that were shuttered with no indication that any business was conducted at that location; and/or

- Unlike legitimate retail DME companies, Tadchiev, through Medsource Solutions, entered into illicit relationships with the No-fault Clinics which, in exchange for kickbacks and/or a fee, provided Medsource Solutions with prescriptions and/or referrals for Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

89.     In these and numerous other ways, Defendants sought to deceive Plaintiff into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

90.     The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Tadchiev engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) ensure that their HCPs prescribed large amounts of virtually identical DME to their patient population, and/or (ii) fabricate and/or fraudulently alter prescriptions issued by the HCPs, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Medsource Solutions, numerous fraudulent claim forms seeking payment for DME that were purportedly (but not actually) provided to many Covered Persons;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiff; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiff, knowing that they contained materially false and misleading information.

91.     At all relevant times mentioned herein, Tadchiev knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME.

92.     At all relevant times mentioned herein, Tadchiev, through Medsource Solutions, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and claim forms in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

93.     At all relevant times mentioned herein, Tadchiev and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiff, in particular, of money.

**THE MECHANICS OF THE SCHEME TO DEFRAUD**

94.     Beginning in April 2018 and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Rental DME to Covered Persons.

95.     Tadchiev incorporated, owned and/or controlled Medsource Solutions for the purpose of defrauding insurers, in general, and Plaintiff, in particular.

96.     On information and belief, Medsource Solutions, through Tadchiev, engaged in a pervasive  scheme to defraud, wherein Tadchiev: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of DME; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) obtained and

submitted to insurers, in general, and Plaintiff, in particular, prescriptions which they knew to be fabricated and/or fraudulently altered; (iv) arranged for the No-fault Clinics to have assignments of benefits and acknowledgement of delivery receipt forms signed by Covered Persons on their behalf to ensure that they had all of the documents necessary to submit claims to insurers, in general, and Plaintiff, in particular; and (v) systematically submitted bills to insurers, in general, and Plaintiff, in particular, for DME that were purportedly provided to Covered Persons based on medical necessity when, in fact, Tadchiev, through Medsource Solutions, determined the DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving a substantially similar Rental DME for a substantially similar timeframe regardless of medical necessity.

97.     Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiff, in particular, for expensive DME that was never provided, or if provided, was provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity  materially misrepresented in their fraudulent bill submissions to Plaintiff.

98.     Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of DME, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary, including but not limited to prescriptions for Rental DME.

99.     Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

100.     As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with Medsource Solutions, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Medsource Solutions by causing their HCPs to write DME prescriptions in accordance with a pre-determined protocol.

101.     In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for DME.  Instead, these prescriptions were given directly to Medsource Solutions to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of DME.

102.     In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiff, virtually every bill submitted by Medsource Solutions deliberately obscured the medical necessity of the billed-for DME devices so as to prevent Plaintiff from determining the appropriate charges associated with any such DME and/or orthotic device or whether the specific DME was in fact medically necessary.

103.     Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiff well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiff's expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and/or peer reviews.

## FRAUDULENT BILLING OF RENTAL DME ITEMS

104.   In furtherance of the scheme to defraud alleged herein, Medsource Solutions, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

105.   As part of the scheme, the Covered Persons receiving the expensive rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and several pieces of standard DME and/or orthotic devices—in some instances, receiving up to eight (8) to ten (10) items.

106.   As part of this standard battery of treatment and prescribed contemporaneously with the battery of standard DME and/or orthotic devices, Medsource Solutions routinely provides Covered persons with a SAM device, invariably on a rental basis for a period of forty-two days.

107.   Months after the accident, as part of the fraudulent protocol of treatment, in some instances Covered Persons are eventually referred for arthroscopic surgery and/or other pain management procedures at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.  These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

108.     Not long before the surgery, on the same day as the surgery, and/or within a few short days after the surgery, the Covered Persons are often prescribed additional expensive rental DME and/or compression devices, as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration.  Covered Persons, in some instances, receive at least four or more rental items, for up to 28 days or longer, in some cases exceeding $10,000.00 in total cost for all of the items.

109.     Such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by Retail Defendants.  In that regard, the supply of such items was motivated by money, without regard to the actual need of the patients, for the express purpose of increasing the amount of reimbursement sought from insurers in general, and Plaintiff in particular.

**1.      Fraudulent billing of Sustained Acoustic Medicine Devices**

110.     In furtherance of the scheme to defraud alleged herein, Tadchiev, through Medsource Solutions, routinely submitted bills to Plaintiff for Sustained Acoustic Medicine ("SAM") devices that were not provided as billed, supplied pursuant to fraudulent protocol of treatment, medically unnecessary and/or never provided.

111.     The SAM device is a battery powered, wearable and portable device that purports to produce ultrasound at a frequency of 3 megahertz in order to provide heat related medical therapy through the delivery of low-intensity acoustic waves for the treatment of acute and chronic tendinopathies, muscle strain or spasms, or pain associated with osteoarthritis for a two to six week period.

112.    Notwithstanding its intended use, the ultrasound purportedly provided by the SAM device is insufficient to produce clinically effective heating. For example, the strength of the ultrasound in the SAM device is listed at 0.00132 Watts/centimeter which is about a thousand times weaker than standard ultrasound that is used clinically in physical therapy.

113.    Notwithstanding the typical uses for the devices, referring HCPs routinely issue prescriptions for SAM devices for patients that were involved in minor impact accidents and suffered only minor, soft tissue injuries, to the extent the suffered any injuries at all, along with a host of other expensive DME devices as part of a fraudulent protocol of medically unnecessary treatments, designed to upcharge insurers for tens of thousands of dollars. In that regard, prior to or contemporaneously with dispensing the SAM device, the patients routinely receive a substantial and similar battery of regular and rental DME pursuant to a fraudulent protocol established by the No-fault Clinics that issue the fraudulent prescription.  By way of example and not limitation:

- In connection with claims submitted on behalf of Covered Person R.M., claim number 1046433-01, Plaintiff was billed for at least ten pieces of regular DME, in addition to the SAM unit purportedly provided by Defendant Medsource Solutions, Inc.  Starting December 20, 2018, Defendant Medsource Solutions purportedly provided a SAM device for a forty-two day rental period for a total of $2,667.00, along with accompanying SAM patches for $360.00. On January 1, 2019, Central Supplies of NY Corp. (not named as a defendant in the Complaint) purportedly provided a Lumbar Cushion for $282.20, a custom fitted LSO for $322.98, a Massager for $355.56, a Bed Board for $101.85, an Eggcrate Mattress for $155.52, a Cervical Collar for $233.00, a Cervical Pillow for $22.04 and a Water Circulation Unit with Hot/Cold Pad w/Pump for $647.82.  On February 7, 2019, Big Apple Med Equipment Inc. (not named as a defendant in the Complaint) purportedly provided a second custom fitted LSO for $844.13 and a Cervical Traction Unit for $502.63.  In total, Plaintiff was billed for $6,494.73 in connection with at least twelve pieces of DME.

- In connection with claims submitted on behalf of Covered Person G.Z., claim number 1060726-01, Plaintiff was billed for at least ten pieces of regular DME, in addition to the SAM unit purportedly provided by Defendant Medsource Solutions, Inc.  On June 28, 2019, Union DME Corp. (not named as a defendant in the Complaint) purportedly provided a custom fitted LSO for $322.98, a Back Massager for $182.00, a Bed Board for $101.85, a Dry Pressure Mattress for $153.13, a Cervical Collar for $233.00, a Cervical Pillow for $22.04 and a Water Cold Water Circulating Unit for $292.50 and a TENS/EMS Unit for $333.00.  Starting July 16, 2019, Defendant Medsource Solutions purportedly provided a SAM device for a forty-two day rental period for a total of $2,667.00, along with accompanying SAM patches for $360.00. On August 8, 2019, Mogul Supplies Inc. (not named as a defendant in the Complaint) purportedly provided a Cervical Traction Unit for $502.63, and on August 22, 2019, purportedly provided a second custom fitted LSO for $844.13 and.  In total, Plaintiff was billed for $6,014.26 in connection with at least twelve pieces of DME.

- In connection with claims submitted on behalf of Covered Person R.R., claim number 1071252-01, Plaintiff was billed for at least nine pieces of regular DME, in addition to the SAM unit purportedly provided by Defendant Medsource Solutions, and additional pre- and post-operative rental DME.  Starting November 6, 2019, Reliable Therapy Equipment, Inc. (not named as a defendant in the Complaint) purportedly provided a SAM device for a forty-two day rental period for a total of $2,604.00, along with accompanying coupling patches for $360.00. Starting seven days later on November 13, 2019, Defendant Medsource Solutions also purportedly provided a SAM device for a forty-two day rental period, but for a total of $2,667.00, along with accompanying SAM patches for $360.00. On November 29, 2019, Jamaica Supplies Corp. (not named as a defendant in the Complaint) purportedly provided a custom fitted LSO for $322.98, a Back Massager for $196.80, an Overbed Table to fill a prescription for a Bed Board for $101.85, a Dry Pressure Mattress for $153.13, an Electric Heat Pad for $20.93, a TENS/EMS Unit for $76.25, and a custom fitted Knee Orthosis for $110.00.  On December 2, 2019, Quality Med Equip Inc. (not named as a defendant in the Complaint) purportedly provided a second custom fitted LSO for $806.64 and a Cervical Traction Unit for $502.63. On February 6, 2020, MAZ Supply Inc. (not named as a defendant in the Complaint) purportedly provided a single day rental Thermotek ASC Cold Compression device at an ambulatory surgical center for $281.00, along with accompanying appliance for $56.04, and a Shoulder Orthosis for $111.07.  That same day, TrombMed Inc. (not named as a defendant in the Complaint) purportedly provided a single day rental Pneumatic Compressor at the ambulatory surgical center for $531.06, along with accompanying appliance for $89.56.  Starting February 7, 2020, Introgen Inc. (not named as a defendant in the Complaint) purportedly provided a CPM for the

Shoulder for a twenty-eight day rental period for a total of $2,968.00, along with accompanying sheepskin pad for $19.50.  Also starting February 7, 2020, Trinity Bracing Inc. (not named as a defendant in the Complaint) purportedly provided a Cold Compression DVT device for a twenty-eight day period for a total of $1,812.00, along with accompanying appliance for $89.56, and a second shoulder orthosis for $111.07. Starting September 11, 2020, Ortho City Services Inc purportedly provided an intermittent pneumatic cold compression device for a twenty-one day rental period for a total of In total, Plaintiff was billed for $16,122.02 in connection with at least twenty-two pieces of DME.

- In connection with claims submitted on behalf of Covered Person G.R., claim number 1088402-03, Plaintiff was billed for at least nine pieces of regular DME, in addition to the SAM unit purportedly provided by Defendant Medsource Solutions, and additional peri- and post-operative rental DME.  Starting October 18, 2020, Defendant Medsource Solutions purportedly provided a SAM device for a forty-two day rental period for a total of $2,667.00, along with accompanying SAM patches for $360.00. On October 29, 2020, All Nations DME Corp. (not named as a defendant in the Complaint) purportedly provided a Lumbar Cushion for $282.20, a Back Massager for $199.99, a Bed Board for $93.85, an Eggcrate Mattress for $153.13, a Cervical Collar for $233.00, a Cervical Pillow for $22.04 and an Infrared Lamp for $536.55.  On December 21, 2020, NovelDME Inc. (not named as a defendant in the Complaint) purportedly provided a custom fitted LSO for $1041.07 and a Cervical Traction Unit for $502.63.  On January 10, 2021, Floral Med Supply Inc (not named as a defendant in the Complaint) purportedly provided a single day rental peri-operative 3M Bair Hugger warming device at an ambulatory surgical center for $223.00 along with accompanying fill body blanket for $19.75.  That same day, Lima Supply Inc. (not named as a defendant in the Complaint) purportedly provided a single day rental Cold Compression device at the ambulatory surgical center for $285.00, along with accompanying appliance for $56.04, and a custom fitted Shoulder Orthosis for $372.50.  Also, that same day, Med Trove Inc. (not named as a defendant in the Complaint) purportedly provided a single day rental Pneumatic Compressor at the ambulatory surgical center for $531.06, along with accompanying appliance for $89.56. In total, Plaintiff was billed for $7,668.57 in connection with at least twelve pieces of DME.

- In connection with claims submitted on behalf of Covered Person T.J., claim number 1094699-02, Plaintiff was billed for at least ten pieces of regular DME, in addition to the SAM unit purportedly provided by Defendant Medsource Solutions, Inc.  Starting March 16, 2021, Defendant Medsource Solutions purportedly provided a SAM device for a forty-two day rental period for a total of $2,667.00, along with accompanying SAM patches for $360.00. On March 18, 2021, All Nations DME Corp. (not named as a defendant in the Complaint) purportedly provided a Lumbar Cushion for $282.40, a Back Massager for $199.92, a Bed Board for $93.85, an Eggcrate Mattress for $153.15, a Cervical Collar for $233.00, and a Cervical Pillow for $22.04.  On April 16, 2021, NovelDME Inc. (not named as a defendant in the Complaint) purportedly provided a Cervical Traction Unit for $502.63. On May 17, 2021, AMA Supply Inc. (not named as a defendant in the Complaint) purportedly provided a custom fitted LSO for $844.13, on May 26, 2021 purportedly provided a second Cervical Traction Unit for $502.63, and on June 11, 2021, purportedly provided custom fitted Shoulder Orthoses for both right and left shoulders for $499.12 each.  In total, Plaintiff was billed for $6,859.15 in connection with at least twelve pieces of DME.

114.    The heating pattern of the SAM device is circumscribed and not useful for large areas of tissues such as prescribed by the referring HCP.  For example, the ultrasound purportedly provided by the SAM device only heats the tissue directly below the transducer, making it impractical for heating large areas such as trapezius muscles and cervical or lumbosacral paraspinal muscles.

115.    The SAM devices are prescribed with at least eight (8) to ten (10) pieces of standard DME and/or orthotic devices as part of a predetermined treatment protocol irrespective of medical necessity.

116.    The SAM devices are also, at times, prescribed with one or more other rental DME devices such as CPMs, CTUs, and/or pneumatic compression devices.  Each of these devices are typically rented to the Covered Persons for a period of three to six weeks either before or within a few days of the patients' surgery.

117.    The prescriptions for the SAM devices are never given to the patients.  Instead, the prescriptions are sent from many of the same referring medical clinics directly to a predetermined

Rental DME provider in exchange for a kickback and/or other financial incentive or compensation.

118.    The prescriptions from the referring providers are fabrications as part of the scheme to maximize reimbursement through these medically unnecessary rental items and the SAM devices in particular.

119.    Upon receipt of the prescriptions for the SAM devices, Medsource Supplies submits bills to insurers in amounts of up to $2,667.00, routinely charging a daily rental rate for the items at $63.50 per day for periods of six (6) weeks regardless of actual patient need in order to maximize reimbursement.

120.    To avoid any suspicions concerning the inflated charges, Medsource Solutions often unbundles the charges, splitting bills up into periods ranging from eight (8) to twenty-one (21) days to disguise the total amount of the charge.

121.    Oftentimes, the devices are delivered to the patients without the patients' knowledge that they were going to receive the device.  Upon delivery, proper instruction on the use of the device and the risks associated with the device are not explained to the patients.  In many cases and as a result, the patients do not use the device and/or use the device improperly posing a risk to the patients' health as well rendering the device ineffective.

122.    By way of example and not limitation, Tadchiev, through Medsource Solutions, routinely submitted bills to Plaintiff for SAM devices under code E1399 in amounts up to and including $2,667.00, which were not provided as billed, if any were provided at all, and were supplied pursuant to a fraudulent protocol of treatment. Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of claims submitted for Medsource Solutions to Plaintiff where Medsource Solutions submitted fraudulent bills for SAM devices under codes

E1399 and/or E1399 RR at the daily rental rate of $63.50/day in amounts ranging from $1,333.50 to $2,667.00, and accompanying coupling patches billed under code A9999 in the amount of $360.00.

## DISCOVERY OF THE FRAUD

123.    To induce Plaintiff to promptly reimburse their claims for DME and/or orthotic devices, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Tadchiev, through Medsource Solutions, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Tadchiev, through Medsource Solutions, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Tadchiev, through Medsource Solutions, knowingly misrepresented and concealed that Medsource Solutions' claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Tadchiev, through Medsource Solutions, knowingly and deliberately concealed the amounts Medsource Solutions was entitled to be reimbursed in the bills submitted to Plaintiff by mispresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable Fee Schedule in order to maximize the charges that they could submit to Plaintiff and other insurers.

124.    Plaintiff is under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiff in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiff to justifiably rely on them.

As a proximate result, Plaintiff have incurred damages of more than $61,500.00 based upon the fraudulent bill submissions.

125.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiff, Plaintiff did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANTS TADCHIEV, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

126.    The allegations of paragraphs 1 through 125 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

127.    At all times relevant herein, Medsource Solutions was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

128.    From, in or about April 11, 2018 through the date of the filing of this Complaint, Defendants Tadchiev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, knowingly conducted and participated in the affairs of the Medsource Solutions enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

129.    At all relevant times mentioned herein, Defendant Tadchiev, together with others unknown to Plaintiff, exerted control over and directed the operations of the Medsource Solutions enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiff American Transit Insurance Company, that were based, in part, on the utilization of fraudulent prescriptions.

130.    One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation that grossly inflated the purported cost and/or necessity of the DME, to facilitate the fraudulent billing alleged in the Complaint.  One or more of the ABC Corporations furnished documents that Defendant Tadchiev required, in furtherance of the scheme to defraud, to obtain payment from Plaintiff for fraudulent DME and/or orthotic device claims.

131.    It was both foreseeable and the intended consequence that the documents provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiff.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

132.    The racketeering acts set forth herein were carried out on a continued basis for more than a four-year period, were related and similar and were committed as part of the ongoing scheme of Defendants Tadchiev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 to fraudulently bill for DME to defraud insurers, and, if not stopped, such acts will continue into the future.

133.   This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Medsource Solutions continues to pursue collection on the fraudulent billing to the present day.

134.   As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Tadchiev, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiff and to induce Plaintiff to issue checks to the Medsource Solutions enterprise based upon materially false and misleading information.

135.   Through the Medsource Solutions enterprise, Defendant Tadchiev submitted numerous fraudulent claim forms seeking payment for DME and/or orthotic devices that were purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Defendant Tadchiev, as well as the payments that Plaintiff made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Tadchiev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a continuous series of predicate acts of mail fraud, extending from the formation of the Medsource Solutions enterprise through the filing of this Complaint.

136.   A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Tadchiev, in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

137.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

138.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

139.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiff American Transit Insurance Company has been injured in its business and property and Plaintiff has been damaged in the aggregate amount presently in excess of $61,500.00, the exact amount to be determined at trial.

140.     Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover from Defendants Tadchiev, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS MEDSOURCE SOLUTIONS AND TADCHIEV**

**(Common Law Fraud)**

141.     The allegations of paragraphs 1 through 125 are hereby repeated and realleged as though fully set forth herein.

142.     Defendants Medsource Solutions and Tadchiev made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiff American Transit Insurance Company for payment.

143.     Each and every bill and supporting documentation submitted by Defendants Medsource Solutions and Tadchiev to Plaintiff set forth false and fraudulent amounts for

reimbursement for DME and/or orthotic devices that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiff but constitute a grave and serious danger to the Covered Persons and the consumer public.

144.    Defendants Medsource Solutions and Tadchiev intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Medsource Solutions was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME and/or orthotic devices, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; and (b) not billed in excess of the maximum permissible monthly rental charge or the maximum accumulated rental charge for such equipment, supplies and services provided on a rental basis under the applicable Fee Schedule (c) not billed in excess of the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office, if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service prior to April 4, 2022; and/or (d) not billed in excess of the lesser of the providers' acquisition cost plus 50% or the usual and customary price charged by durable medical equipment providers to the general public if no maximum monthly rental rate is provided in the applicable Fee Schedule for dates of service after April 4, 2022;

- False and misleading prescriptions for the DME purportedly supplied to Covered Person, generically describing the item to conceal the type of item being prescribed;

- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby, Defendant Tadchiev, through Medsource Solutions, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of

substantially similar, medically unnecessary DME; (b) DME was not covered by the applicable Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit Defendant Tadchiev, through Medsource Solutions, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiff and other insurers.

145.    The foregoing was intended to deceive and mislead Plaintiff into paying Defendant Medsource Solutions' claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

146.    Defendants Medsource Solutions and Tadchiev knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiff to rely thereon.

147.    Plaintiff did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiff was led to believe existed as a result of the acts of fraud and deception of Defendants Medsource Solutions and Tadchiev.

148.    Had Plaintiff known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid the Defendant Medsource Solutions' claims for No-fault insurance benefits submitted in connection therewith.

149.    Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Medsource Solutions and Tadchiev evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiff to recovery of exemplary and punitive damages.

150.    By reason of the foregoing, Plaintiff American Transit Insurance Company has sustained compensatory damages and been injured in its business and property in an amount as yet

to be determined, but believed to be in excess of $61,500.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANTS MEDSOURCE SOLUTIONS AND TADCHIEV

### (Unjust Enrichment)

151.     The allegations of paragraphs 1 through 125 are hereby repeated and realleged as though fully set forth herein.

152.     By reason of their wrongdoing, Defendants Medsource Solutions and Tadchiev have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiff American Transit Insurance Company that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

153.     Plaintiff is therefore entitled to restitution from Defendants Medsource Solutions and Tadchiev in the amount by which it has been unjustly enriched.

154.     By reason of the foregoing, Plaintiff American Transit Insurance Company have sustained compensatory damages and been injured in its business and property in an amount as yet to be determined, but believed to be in excess of $61,500.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

## AGAINST MEDSOURCE SOLUTIONS

### (Declaratory Judgment under 28 U.S.C. § 2201)

155.     The allegations of paragraphs 1 through 125 are hereby repeated and realleged as though fully set forth herein.

156.    At all relevant times mentioned herein, each and every bill mailed by the Tadchiev, through Medsource Solutions, to Plaintiff sought reimbursement in excess of the amounts authorized by the No-fault Law and effective Fee Schedule by materially misrepresenting the DME provided, if provided at all, as well as the cost and quality of the billed for DME.

157.    To the extent the DME was provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

158.    At all times relevant herein, the Retail Defendants exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiff, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

159.    In view of the Retail Defendants' submission of fraudulent bills to Plaintiff, Plaintiff contends that Medsource Solutions has no right to receive payment for any pending bills they have submitted because:

- Tadchiev, through Medsource Solutions, made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiff;

- Tadchiev, through Medsource Solutions, made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

160.    As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME purportedly supplied to Covered Persons and the amounts they

were entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and effective Fee Schedules in their claims submissions, obtain reimbursement far in excess of the maximum permissible charges they were entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that Medsource Solutions is not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiff, therefore, is under no obligation to pay any of Medsource Solutions' No-fault claims.

161.    Plaintiff has no adequate remedy at law.

162.    Tadchiev, through Medsource Solutions will continue to bill Plaintiff for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiff has no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury.

**WHEREFORE,** Plaintiff demands judgment as follows:

i)      Compensatory damages in an amount in excess of $61,500.00, the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)     Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)      Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiff has no obligation to pay any No-fault claims submitted by Medsource Solutions because (1) Medsource Solutions made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiff; and (ii) Medsource Solutions made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiff seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)     Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
           September 7, 2022

                                        Morrison Mahoney LLP


                                        By:___/s/ Lee Pinzow_____
                                              Robert A. Stern, Esq.
                                              James McKenney, Esq.
                                              Lee Pinzow, Esq.
                                              Attorneys for Plaintiff
                                              Wall Street Plaza
                                              88 Pine Street, Suite 1900
                                              New York, New York 10005
                                              (212) 825-1212

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN TRANSIT INSURANCE COMPANY,<br><br>                              Plaintiff,<br><br>   -against-<br><br><br>MEDSOURCE SOLUTIONS, INC, ILYA TADCHIEV, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                              Defendants. | CIVIL ACTION<br><br>22-CV-5317<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

# COMPLAINT

MORRISON MAHONEY, LLP
ATTORNEYS FOR PLAINTIFF
WALL STREET PLAZA
88 PINE STREET, SUITE 1900
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 825-1212